**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FIRST CHOICE FEDERAL CREDIT UNION, AOD FEDERAL CREDIT UNION, TECH CREDIT UNION, VERIDIAN CREDIT UNION, SOUTH FLORIDA EDUCATIONAL FEDERAL CREDIT UNION, PREFERRED CREDIT UNION, ALCOA COMMUNITY FEDERAL CREDIT UNION, ASSOCIATED CREDIT UNION, CENTRUE BANK, ENVISTA CREDIT UNION, FIRST NBC BANK, NAVIGATOR CREDIT UNION, THE SEYMOUR BANK, FINANCIAL HORIZONS CREDIT UNION, NUSENDA CREDIT UNION, GREATER CINCINNATI CREDIT UNION, KEMBA FINANCIAL CREDIT UNION, WRIGHT-PATT CREDIT UNION, and MEMBERS CHOICE CREDIT UNION, on Behalf of Themselves and All Others Similarly Situated, | Civil No. 2:16-cv-00506-NBF-MPK |
| and | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |
| CREDIT UNION NATIONAL ASSOCIATION, GEORGIA CREDIT UNION AFFILIATES, INDIANA CREDIT UNION LEAGUE, MICHIGAN CREDIT UNION LEAGUE, and OHIO CREDIT UNION LEAGUE, | |
| Plaintiffs, | |
| v. | |
| THE WENDY'S COMPANY, WENDY'S RESTAURANTS, LLC, and WENDY'S INTERNATIONAL, LLC, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.     BACKGROUND ............................................................................................2

    A.    The Data Breach and Early Litigation Stages ...........................................2

    B.    Discovery, Further Motion Practice, and Settlement Discussions..........................4

II.    PROVISIONS OF THE SETTLEMENT AGREEMENT....................................5

    A.    The Settlement Class ...............................................................................5

    B.    The Direct Benefits to the Settlement Class .............................................6

        1.    The $50 Million Settlement Fund .................................................6

        2.    Additional Security Measures ......................................................7

    C.    Releases..................................................................................................8

    D.    Proposed Notice Program .......................................................................8

    E.    Attorneys' Fees, Costs, and Expenses ...................................................11

    F.    Service Awards .....................................................................................11

III.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
        ADEQUATE..............................................................................................12

    A.    Standard for Preliminary Approval of the Settlement .............................12

    B.    The Adequacy of Class Counsel and Settlement Class Representatives
        Supports Preliminary Approval .............................................................14

    C.    The Negotiation Process Supports Preliminary Approval .......................15

    D.    The Adequacy of the Settlement Benefits in Light of the Risks of Continued
        Litigation Supports Preliminary Approval..............................................16

        1.    The Relief Provided to the Settlement Class Is Substantial......................16

        2.    The Risks of Continued Litigation Are Significant ....................18

        3.    The Proposed Method of Distributing Relief to the Settlement Class
            Is Effective ...............................................................................20

        4.    Class Counsel's Request for Attorneys' Fees, Expenses, and Costs
            Will Be Subject to Approval by the Court..................................21

E.      That Settlement Class Members Are Treated Equitably Relative to Each
        Other Supports Preliminary Approval ....................................................................22

IV.     THE SETTLEMENT CLASS SHOULD BE CERTIFIED...............................................22

        A.      Ascertainability .......................................................................................................23

        B.      Rule 23(a) Requirements ........................................................................................24

                1.      Numerosity....................................................................................................24

                2.      Commonality..................................................................................................25

                3.      Typicality.......................................................................................................26

                4.      Adequacy .......................................................................................................27

        C.      Rule 23(b) Requirements .......................................................................................27

                1.      Predominance.................................................................................................28

                2.      Superiority......................................................................................................29

V.      THE PROPOSED NOTICE PROGRAM SATISFIES RULE 23 AND DUE
        PROCESS AND SHOULD BE APPROVED ....................................................................31

        A.      The Scope of the Proposed Notice Program Is Adequate.....................................31

        B.      The Form and Content of the Proposed Notices Is Adequate...............................32

        C.      The Proposed Claim Form Is Adequate.................................................................33

        D.      The Settlement Administrator Is Adequate............................................................33

VI.     CO-LEAD COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL .................34

VII.    CONCLUSION...................................................................................................................34

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*,
 263 F.R.D. 226 (E.D. Pa. 2009).................................................................................14

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591 (1997)...............................................................................................23, 31

*AOD Fed. Credit Union v. The Wendy's Co.*,
 No. 2:16-cv-00900 (W.D. Pa.)....................................................................................3

*In re Asbestos Sch. Litig.*,
 104 F.R.D. 422 (E.D. Pa. 1984), *aff'd in part and rev'd in part sub nom.*
 *In re Sch. Abestos Litig.*, 789 F.2d 996 (3d Cir. 1986) ...........................................25

*In re Auto. Refinishing Paint Antitrust Litig.*,
 MDL No. 1426, 2003 WL 23316645 (E.D. Pa. Sept. 5, 2003) ...............................15

*In re Auto. Refinishing Paint Antitrust Litig.*,
 MDL No. 1426, 2004 WL 1068807 (E.D. Pa. May 11, 2004) ................................12

*Baby Neal for and by Kanter v. Casey*,
 43 F.3d 48 (3rd Cir. 1994) ..................................................................................25, 28

*Byrd v. Aaron's Inc.*,
 784 F.3d 154 (3d Cir. 2015)...............................................................................23, 24

*In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*,
 269 F.R.D. 468 (E.D. Pa. 2010)........................................................................19, 23

*In re Chambers Dev. Sec. Litig.*,
 912 F. Supp. 822 (W.D. Pa. 1995)....................................................................20, 33

*Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*,
 887 F.3d 803 (7th Cir. 2018) .....................................................................................19

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)......................................................................................................29

*Cumberland Farms, Inc. v. Browning-Ferris Indus., Inc.*,
 120 F.R.D. 642 (E.D. Pa. 1988)........................................................................25, 26

*Fisher v. Va. Elec. & Power Co.*,
 217 F.R.D. 201 (E.D. Va. 2003) ..............................................................................28

*In re Flat Glass Antitrust Litig.*,
    191 F.R.D. 472 (W.D. Pa. 1999) ..................................................................24, 25

*Gates v. Rohm & Haas Co.*,
    248 F.R.D. 434 (E.D. Pa. 2008)...........................................................12, 14, 23

*In re Gen. Instruments Sec. Litig.*,
    209 F. Supp. 2d 423 (E.D. Pa. 2001) ................................................................20

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)..........................................................................14, 23

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975)........................................................................13, 14

*Hayes v. Wal-Mart Stores, Inc.*,
    725 F.3d 349 (3d Cir. 2013)..............................................................................28

*In re Home Depot Customer Data Sec. Breach Litig.*,
    No. 1:14-md-02583 (N.D. Ga.)................................................................16, 17, 23

*In re Ins. Brokerage Antitrust Litig.*,
    297 F.R.D. 136 (D.N.J. 2013)............................................................................12

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) ..........................................................12, 15

*In re Mid-Atl. Toyota Antitrust Litig.*,
    564 F. Supp. 1379 (D. Md. 1983)......................................................................12

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950)..........................................................................................31

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    301 F.R.D. 191 (E.D. Pa. 2014), *final approval aff'd*,
    821 F.3d 410 (3d. Cir. 2016)............................................................................13

*O'Keefe v. Mercedes-Benz USA, LLC*,
    214 F.R.D. 266 (E.D. Pa. 2003)........................................................................28

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
    176 F.R.D. 158 (E.D. Pa. 1997)........................................................................15

*Petruzzi's, Inc. v. Darling-Del. Co., Inc.*,
    880 F. Supp. 292 (M.D. Pa. 1995)....................................................................20

*In re Processed Egg Prods. Antitrust Litig.*,
    284 F.R.D. 249 (E.D. Pa. 2012)........................................................................19

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
    148 F.3d 283 (3d Cir. 1998)..................................................................................26, 30

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,*
    177 F.R.D. 216 (D.N.J. 1997)........................................................................................32

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,*
    962 F. Supp. 450 (D.N.J. 1997) ......................................................................12, 13, 33

*In re Remeron End-Payor Antitrust Litig.,*
    No. Civ. 02-2007 FSH, 2005 WL 2230314 (D.N.J. Sept. 13, 2005).....................20

*Rodriguez v. McKinney,*
    156 F.R.D. 118 (E.D. Pa. 1994).....................................................................................28

*S. Fla. Educ. Fed. Credit Union v. The Wendy's Co.,*
    No. 2:16-cv-00873 (W.D. Pa.)..........................................................................................3

*Sala v. Nat'l R.R. Passenger Corp.,*
    120 F.R.D. 494 (E.D. Pa. 1988)....................................................................................28

*Seidman v. Am. Mobile Sys., Inc.,*
    157 F.R.D. 354 (E.D. Pa. 1994).......................................................................24, 26, 27

*Silvis v. Ambit Energy L.P,*
    No. 14-5005, 2018 WL 1010812 (E.D. Pa. Feb. 22, 2018) ....................................14

*Stewart v. Abraham,*
    275 F.3d 220 (3d Cir. 2001)...........................................................................................25

*Stewart v. Rubin,*
    948 F. Supp. 1077 (D.D.C. 1996), *aff'd,*
    124 F.3d 1309 (D.C. Cir. 1997) ....................................................................................20

*Taha v. Cty. of Bucks,*
    862 F.3d 292 (3d Cir. 2017)...........................................................................................28

*In re Target Corp. Customer Data Sec. Breach Litig.,*
    309 F.R.D. 482 (D. Minn. 2005)..............................................................................23, 29

*In re Target Customer Data Sec. Breach Litig.,*
    No. 0:14-md-02522 (D. Minn.).................................................................................16, 17

*Tech Credit Union v. The Wendy's Co.,*
    No. 2:16-cv-00854 (W.D. Pa.)..........................................................................................3

*In re TJX Cos. Retail Sec. Breach Litig.,*
    246 F.R.D. 389 (D. Mass. 2007)...................................................................................19

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016)......................................................................................29

*Veridian Credit Union v. The Wendy's Co.*,
    No. 2:16-cv-00831 (W.D. Pa.).............................................................................3

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)......................................................................................25

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)...................................................................13, 23, 30

*Winsouth Credit Union v. Mapco Express, Inc.*,
    No. 3:14-cv-01573 (M.D. Tenn.)........................................................................23

## STATUTES, RULES & REGULATIONS

FEDERAL RULES OF PROCEDURE
    Rule 23(a)(1)-(4)..............................................................................................24
    Rule 23(b)(3)(A)-(D) .......................................................................................30
    Rule 23(c)(2).....................................................................................................32
    Rule 23(c)(2)(B)(i)-(vii)...................................................................................33
    Rule 23(e)(1)-(2)..............................................................................................12
    Rule 23(e)(1)(B)...............................................................................................12
    Rule 23(e)(2)(A)-(D) .......................................................................................13
    Rule 23(e)(2)(C)(i)-(iii)...................................................................................16
    Rule 23(e)(2)(C)(iv)..........................................................................................16
    Rule 23(g)(1)(A)(i)-(iv) ...................................................................................34

## OTHER AUTHORITIES

*Visa Global Compromised Account Recovery Program: What Every Merchant
    Should Know About GCAR*, VISA (2013) ....................................................17, 18

W. Rubenstein, NEWBERG ON CLASS ACTIONS §4:54, 206-08 (5th ed. 2012)............................28

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Financial Institution Plaintiffs [1] and Association Plaintiffs (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their unopposed motion for preliminary approval of a class action settlement (the "Motion").  The proposed Settlement Agreement between Plaintiffs and Defendants The Wendy's Company, Wendy's Restaurants, LLC, and Wendy's International, LLC (collectively, "Wendy's" or "Defendants") was reached after two-and-a-half years of litigation and discovery and three rounds of mediation.

Under the Settlement, Wendy's will pay $50 million into a non-reversionary fund in exchange for a release of all claims against Wendy's Franchisees arising from third-party criminal cyberattacks of certain of Wendy's independently owned and operated franchisee restaurants involving malware variants targeting customers' payment card information that Wendy's reported in 2016 (the "Data Breach").  Wendy's also will adopt or maintain certain reasonable safeguards to manage its data security risks.  If approved, the Settlement will resolve all pending claims in these consolidated actions and provide monetary relief to a nationwide class of payment-card-issuing financial institutions.  The Settlement is an excellent result in a complex, high-risk, hard-fought case that provides a substantial financial recovery for payment card issuers that suffered losses as a result of the Data Breach.

Plaintiffs have moved for an order to, among other things: (1)  preliminarily approve the terms of the Settlement as fair, reasonable, and adequate; (2) provisionally certify the Settlement Class pursuant to Fed. R. Civ. P. 23(b)(3) and (e) for settlement purposes only; and (3) approve the Settlement Administrator, Notice Program, form and content of the Notice, and Claim Form.

---

[1]    All capitalized terms not defined herein have the same meaning as those defined in the Settlement Agreement and Release ("Settlement" or "Settlement Agreement" or "SA") attached hereto as Ex. A.

Plaintiffs request that the Motion, which Wendy's does not oppose, be granted. The Settlement meets all of the standards for preliminary approval. The information provided is sufficient to permit the Court to provisionally certify the Settlement Class under Rule 23 and direct Plaintiffs to have notice disseminated. And, the Notice Program – consisting of individualized mailed notice, publication notice, and a toll-free number and website maintained by the Settlement Administrator – is the best practicable notice and comports with both Rule 23 and due process.

In support of their Motion, Plaintiffs submit the proposed Settlement Agreement and its attachments (attached hereto as Ex. A); Declaration of Gary F. Lynch ("Lynch Decl."); Declaration of Richard W. Simmons ("Simmons Decl."); a proposed Preliminary Approval Order (SA Ex. 4); and proposed Final Approval Order and Judgment (SA Ex. 5).

## I. BACKGROUND

### A. The Data Breach and Early Litigation Stages

Plaintiffs allege that, beginning in October 2015, computer hackers installed malware on the point-of-sale ("POS") systems of certain of Wendy's independently owned and operated franchised restaurants for the purposes of capturing and ex-filtrating customer payment card data. ¶¶2, 62.[2] According to the Complaint, the Data Breach involved two malware variants deployed against two types of POS systems in use at the time, and over a period of several months, more than 1,000 Wendy's franchise locations were affected. ¶¶62, 71-72, 77. Based on discovery developed in the Litigation, Plaintiffs estimate that approximately 18 million payment cards were exposed in the Data Breach. Lynch Decl. ¶14. As the Complaint states, a substantial amount of the exposed payment card data was sold on the black market and then used to facilitate fraudulent transactions at the ultimate expense of Financial Institution Plaintiffs and Settlement Class

---

[2]      All "¶" and "¶¶" references are to the Complaint, unless otherwise indicated.

Members.  ¶¶2, 10, 78, 146-47.  Plaintiffs allege financial institutions were forced to cancel and reissue the compromised payment cards to mitigate the damage, reimburse their customers for fraudulent transactions, and otherwise incur substantial out of pocket expenses in responding to the Data Breach.  *Id*.  On February 9, 2016, Wendy's first publicly disclosed that malware had been detected at some of its restaurants.  Subsequent public statements by Wendy's in May, June, and July 2016 gradually revealed the full size and scope of the Data Breach.

On April 25, 2016, Plaintiff First Choice Federal Credit Union filed an action against Wendy's in the U.S. District Court for the Western District of Pennsylvania (the "Western District").  (ECF No. 1).  Thereafter, a number of additional actions were filed by financial institutions against Wendy's in the Western District.  *See Veridian Credit Union v. The Wendy's Co.*, No. 2:16-cv-00831 (W.D. Pa. June 15, 2016) (ECF No. 1); *Tech Credit Union v. The Wendy's Co.*, No. 2:16-cv-00854 (W.D. Pa. June 16, 2016) (ECF No. 1); *S. Fla. Educ. Fed. Credit Union v. The Wendy's Co.*, No. 2:16-cv-00873 (W.D. Pa. June 17, 2016) (ECF No. 1); *AOD Fed. Credit Union v. The Wendy's Co.*, No. 2:16-cv-00900 (W.D. Pa. June 20, 2016).  By orders dated July 12, 2016, these actions were consolidated (ECF No. 20) and the Court appointed Erin Green Comite of Scott+Scott Attorneys at Law LLP ("Scott+Scott") and Gary F. Lynch of Carlson Lynch Sweet Kilpela & Carpenter, LLP ("Carlson Lynch") as interim co-lead class counsel ("Co-Lead Counsel").  (ECF No. 21).

On July 22, 2016, Plaintiffs filed the operative Complaint, asserting claims for negligence, negligence *per se*, violation of the Ohio Deceptive Trade Practices Act ("ODTPA"), Ohio Code §§ 4165.01, *et seq*., and declaratory and injunctive relief.  (ECF No. 32).  On August 22, 2016, Wendy's moved to dismiss the Complaint (the "Motion to Dismiss").  (ECF No. 53).  On February 13, 2017, Chief Magistrate Judge Kelly issued a Report and Recommendation, recommending that

the Court deny the Motion to Dismiss.  (ECF No. 80).  On March 31, 2017, the Court adopted the Report and Recommendation and denied Wendy's Motion to Dismiss.  (ECF No. 88).

### B.        Discovery, Further Motion Practice, and Settlement Discussions

After the Motion to Dismiss was denied, the Parties engaged in significant discovery and motion practice.  Lynch Decl. ¶¶9-10; SA ¶E.  In particular, Plaintiffs served Wendy's with document requests, and Wendy's produced millions of pages of documents, which Plaintiffs reviewed.  *Id*.  Plaintiffs also deposed Wendy's corporate representative, pursuant to Fed. R. Civ. P. 30(b)(6).  *Id*.  Additionally, Plaintiffs obtained and reviewed thousands of pages of documents from numerous third parties in response to subpoenas Plaintiffs served, including subpoenas served on the major card brands.  *Id*.

Wendy's served the Financial Institution Plaintiffs with document requests, to which the Financial Institution Plaintiffs responded with the production of thousands pages of responsive documents.  Lynch Decl. ¶9; SA ¶F.  Wendy's also deposed 16 corporate witnesses for 15 of the Financial Institution Plaintiffs with knowledge of facts relating to the Financial Institution Plaintiffs' response to the Data Breach, designated pursuant to Fed. R. Civ. P. 30(b)(6).  *Id*.

On January 19, 2018, Plaintiffs filed a motion seeking to apply Ohio law to Plaintiffs' claims on a nationwide basis (ECF No. 131), which Wendy's opposed.  (ECF No. 139).  On May 9, 2018, Chief Magistrate Judge Kelly issued a Report and Recommendation, recommending that the Court grant the Motion for Application of Ohio Law, as to the negligence and negligence *per se* claims, and deny it as to the ODTPA claim to the extent any Financial Institution Plaintiffs not located in Ohio sought to assert that claim.  (ECF No. 147 at 14).  District Judge Nora Barry Fischer adopted the Report and Recommendation on June 6, 2018 (ECF No. 152), and shortly thereafter, the Parties were ordered to conduct another alternative dispute resolution process.  (ECF No. 153).

On August 27, 2018, Wendy's filed a Motion for Judgment on the Pleadings (the "MJP"), seeking dismissal of Plaintiffs' claims for negligence and negligence per se on the grounds that they fail under Ohio law.  (ECF No. 163).  Plaintiffs have not responded to the MJP, as the Court extended the deadline for doing so in light of the mediation and settlement efforts.  (*See*, *e.g.*, ECF No. 171).

This Settlement resulted from good faith, arm's-length settlement negotiations, including one full-day mediation before then-retired Honorable Edward Infante, on May 15, 2017, in San Francisco, California,[3] and two full-day mediation sessions before the Honorable Diane M. Welsh (Ret.), on August 29, 2018 and November 16, 2018, in Philadelphia, Pennsylvania.  Lynch Decl. ¶10; SA ¶I.  Two representatives of the Financial Institution Plaintiffs, Susan Bradley of Plaintiff Members Choice Credit Union and Greg Slessor of Plaintiff Veridian Credit Union, attended the August 29, 2018 mediation.  Lynch Decl. ¶11.  In support of their mediation positions, the Parties drafted detailed mediation briefs that explored the strengths and weaknesses of each side's case, including issues of liability, class certification, and proof of damages, and attached numerous exhibits.  *Id.*  The Parties also participated in numerous direct discussions about possible resolution of the Litigation.  *Id.*; SA ¶I.  The Parties did not discuss attorneys' fees, costs, and expenses or Service Awards prior to agreeing to the essential terms of the Settlement.  Lynch Decl. ¶12; SA ¶I.

## II.   PROVISIONS OF THE SETTLEMENT AGREEMENT

### A.   The Settlement Class

For settlement purposes only, the Parties agree that the Court should certify the following "Settlement Class" under Fed. R. Civ. P. 23(b)(3), defined as:

---

[3]   Judge Infante resumed his position on the federal bench as a U.S. Magistrate Judge for the Central District of California before the Parties' second mediation could be scheduled.

> All banks, credit unions, financial institutions, and other entities in the United States (including its Territories and the District of Columbia) that issued Alerted on Payment Cards.  Excluded from the Settlement Class is the judge presiding over this matter and any members of her judicial staff, Wendy's, and persons who timely and validly request exclusion from the Settlement Class.

SA ¶38.  The term "Alerted on Payment Card" means any payment card (including debit or credit cards) that was identified as having been at risk as a result of the Data Breach in an alert or similar document by Visa, MasterCard, Discover, American Express, or JCB.  SA ¶1.  Based on discovery, there are approximately 18 million Alerted on Cards.  Lynch Decl. ¶14.

### B.    The Direct Benefits to the Settlement Class

#### 1.    The $50 Million Settlement Fund

Under the Settlement Agreement, Wendy's will create a non-reversionary, interest-bearing Settlement Fund of $50 million.   SA ¶40.   The Settlement Fund will be used to pay: (1) disbursements to Settlement Class Members that file Approved Claims in accordance with the Distribution Plan (described below); (2) the Costs of Settlement Administration and any taxes due on the Settlement Fund; (3) attorneys' fees, costs, and expenses to Class Counsel in amounts approved by the Court; and (4) Service Awards in amounts approved by the Court.  SA ¶¶40, 40(b).

Under the Distribution Plan (SA Ex. 1) that governs payments from the Settlement Fund, Settlement Class Members that file an Approved Claim will receive a Cash Payment Award per Claimed-On Card without having to submit documentation or prove their losses.[4]  SA ¶40(b); SA Ex. 1 ¶¶2, 2.1.  The amount of the cash payment will depend on the total number of eligible payment cards submitted by Settlement Class Members, the Costs of Settlement Administration,

---

[4]    The term "Claimed-On Card" means an Alerted on Payment Card that was issued by a Settlement Class Member and for which the Settlement Class Member seeks compensation under the Settlement.  SA Ex. 1 ¶1.2.

taxes paid on the Settlement Fund, and the amount of attorneys' fees, costs, and expenses and Service Awards approved by the Court. SA ¶40(b); SA Ex. 1 ¶4.2. By way of example, if valid claims are submitted for all eligible cards, it is estimated that Settlement Class Members could receive approximately $2.00 per Alerted on Payment Card. Lynch Decl. ¶14. If, for example, 40% of Alerted on Payment Cards are submitted in Approved Claims, then Settlement Class Members could receive approximately $4.80 per Alerted on Payment Card. *Id*.

Settlement Class Members have 180 days after the Notice Deadline to submit a Claim Form. The Claim Form (SA Ex. 1, Attachment A), is designed to be simple and straightforward; Settlement Class Members will not be required to provide documentation of their losses beyond identification of the number of Alerted on Payment Cards. SA ¶¶5-6; SA Ex. 1 ¶2.2.

The Parties intend and expect that the entire Settlement Fund will be distributed pursuant to the Distribution Plan through the Claims Administration process. Nonetheless, to the extent any funds remain after the Claims Administration process is completed, no portion of the Settlement Fund will be returned to Wendy's. SA ¶40(b). To the extent there are any remaining funds, however, those funds will be distributed *pro rata* to Settlement Class Members, if administratively feasible, and otherwise to *cy pres* entities that will be selected by Class Counsel and approved by the Court. SA Ex. 1 ¶4.3.

### 2.    Additional Security Measures

If the Settlement is approved, Wendy's will, within 30 days of the issuance of the Final Approval Order and Judgment, and subject to Board approval, adopt and/or maintain the following measures with respect to Company-owned U.S. restaurants and systems as follows:

a.    Wendy's will continue to design and implement reasonable safeguards to manage its data security risks, including by: continuing to maintain and periodically re-evaluate its Information Security Policy and Incident Response Plan or similar document; continuing to maintain monitoring for indicators of compromise on Wendy's computer network endpoints, to the extent required by Payment Card Industry Data Security

Standards ("PCI DSS"); continuing to deploy anti-virus protections on Wendy's-owned store-based IT assets, to the extent required by PCI DSS; continuing to reasonably segment Wendy's network topology; and continuing to conduct regular penetration testing;

      b.    Wendy's will either: (a) continue to maintain Wendy's Technology, LLC ("WeTech") or a similar entity, which will offer to Wendy's Franchisees certain Foundational Security Services, as may be amended from time-to-time in the WeTech Products and Services Agreement or any similar document; or (b) require Wendy's Franchisees to use a Wendy's-approved third-party vendor(s) for similar services; and

      c.    Wendy's will continue to maintain and update, as needed, the information security standards in its Franchisee Operations Manual or a similar document that is distributed to Wendy's Franchisees, and the manual or other similar document will continue to include information regarding the Wendy's Franchisees' independent obligations to comply with PCI DSS pursuant to the card brand rules.

SA ¶41(a)-(c).  Wendy's will materially maintain these additional security measures for at least two years following the Effective Date, subject to certain limited exceptions.  SA ¶42.

## C.    Releases

Plaintiffs, Settlement Class Members who do not opt out, and related persons and entities (*e.g.*, parents, subsidiaries, and counsel) will, if the Settlement is approved and effectuated, release Wendy's and related persons and entities from claims relating to issues in this Litigation.  SA ¶¶62-63, 65.  In turn, Wendy's and their affiliated persons and entities will also release any potential claims or counterclaims against Plaintiffs, Settlement Class Members, and their affiliated entities relating to the institution, prosecution, or settlement of the Litigation.  SA ¶64.

## D.    Proposed Notice Program

Subject to the Court's approval, the Parties propose to individually notify each Settlement Class Member through U.S. Mail and to have the Settlement Administrator establish a toll-free number and Settlement Website to provide information about the Settlement.  SA ¶49; Simmons Decl. ¶¶14-19.  Settlement Class Members will be able to file claims both electronically and by mail.  SA ¶¶35, 49(f).  Publication notice through digital media also will be utilized.  SA ¶49(c).

During the claims period, Settlement Class Members that have not filed claims will receive a post-card reminder notice.  SA ¶49(d).

**<u>Mail Notice</u>**

For purposes of effectuating individualized Mail Notice, Class Counsel have arranged for Visa and MasterCard to submit to the Settlement Administrator the legal address of the financial institutions that issued an Alerted on Payment Card.  Lynch Decl. ¶16.  Class Counsel also will provide relevant contact information to the Settlement Administrator for financial institutions that issued American Express, Discover, and JCB Alerted on Payment Cards.  *Id.*  The Settlement Administrator will use this data, along with other reasonably available sources, to compile a final list of potential Settlement Class Members to which Mail Notice will be issued.  SA ¶¶49(a)-(b); Simmons Decl. ¶13.

For any Mail Notices that are returned undeliverable with forwarding address information, the Settlement Administrator shall re-mail the Mail Notice to the updated address as indicated.  SA ¶49(b); Simmons Decl. ¶15.  For any Mail Notices that are returned undeliverable without forwarding address information, the Settlement Administrator shall use reasonable efforts to identify updated mailing addresses (such as running the mailing address through the National Change of Address Database) and re-mail the Mail Notice to the extent updated addresses are identified.  SA ¶49(b); Simmons Decl. ¶15.  The Settlement Administrator need only make one attempt to re-mail any Mail Notices that are returned as undeliverable.  SA ¶49(b).  However, during the claims period, Settlement Class Members that have not filed claims will receive a post-card reminder.  SA ¶49(d).

Mail Notice will consist of the Long-Form Notice, as well as the Claim Form.  The Long-Form Notice (SA Ex. 2) includes a description of the material terms of the Settlement; a date by which Settlement Class Members may object to or opt out of the Settlement; the date upon which

the Final Approval Hearing will occur; and the address of the Settlement Website at which Settlement Class Members can submit a Claim Form and access the Settlement Agreement and other related documents and information.

The Claim Form (SA Ex. 1, Attachment A) clearly informs the Settlement Class Members of the process they must follow.  It is only two pages long and requires Settlement Class Members to provide very basic information: the name of the financial institution; the person filing out the form; the financial institution's contact information; and the number and brands of Alerted on Payment Cards.  This information will be easy for financial institution employees to locate and provide.  A substantially similar form will appear on the Settlement Website for purposes of electronically submitting a claim.

### Publication Notice

The Settlement Administrator will cause the proposed Summary Notice to be published in digital publications typically read by bank and credit union executives, such as the ABA Banking Journal, in the form depicted in SA Ex. 3.  SA ¶49(c); Simmons Decl. ¶16.

### Settlement Website and Telephone Support

The Settlement Administrator also will establish the Settlement Website, which will contain all the information included in the other forms of notice and will provide links to pertinent case documents.  SA ¶¶35, 45, 46(c); Simmons Decl. ¶¶18-19.  The Settlement Website will permit Settlement Class Members to file claims electronically and will allow Settlement Class Members to submit questions regarding the Settlement to customer support personnel.  SA ¶35; Simmons Decl. ¶¶20-21.  The Settlement Administrator also will establish a toll-free number Settlement Class Members can call for information about the Settlement.  SA ¶¶45, 45(d), 49(b); Simmons Decl. ¶17.  Settlement Class Members will have the option to receive automated information or to speak with a live operator.  SA ¶45(d); Simmons Decl. ¶17.

10

**Opt-Out and Objection Deadlines**

All forms of notice: (1) explain the procedure by which a Settlement Class Member can exclude itself from the Settlement prior to the Opt-Out Deadline (SA ¶50); and (2) explain the procedure for a Settlement Class Member to object to the Settlement or Class Counsel's applications for awards of attorneys' fees, expenses, or Service Awards to Settlement Class Representatives prior to the Objection Deadline.  SA ¶52.  The Opt-Out and Objection Deadlines are 60 days after the Notice Deadline.  SA ¶¶21-22.

### E.    Attorneys' Fees, Costs, and Expenses

Under the Settlement Agreement, Class Counsel will request 30% of the gross Settlement Fund, including any interest earned thereon, from the Court for their attorneys' fees and will additionally request reimbursement of their reasonable costs and expenses from the Settlement Fund.  SA ¶67.  Wendy's agrees not to oppose Class Counsel's request for attorneys' fees and reimbursement of reasonable costs and expenses to be paid from the Settlement Fund.  *Id.*

### F.    Service Awards

Class Counsel will ask the Court to approve, and Wendy's will not oppose, Service Awards of $7,500 to each of the 15 Financial Institution Plaintiffs that were deposed and $2,500 to each of the three Financial Institution Plaintiffs that served as named-Plaintiffs in the Litigation, but were not deposed, or a total of $120,000, to compensate them their efforts in the Litigation and commitment on behalf of the Settlement Class.  SA ¶66.  Any Service Awards approved by the Court will be paid from the Settlement Fund.  *Id.*  Neither Class Counsel's application for nor any individual's entitlement to a Service Award was conditioned in any way upon a Plaintiff's support for the Settlement Agreement.  *Id.*; Lynch Decl. ¶12.

### III.      THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

#### A.      Standard for Preliminary Approval of the Settlement

"[S]ettlement of litigation is especially favored by courts in the class action setting." *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 144  (D.N.J. 2013) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)).  The procedure for review of a proposed class action settlement is a well-established two-step process – preliminary and final approval – that was recently codified under amended Rule 23(e).  Fed. R. Civ. P. 23(e)(1)-(2) (eff. Dec. 1, 2018); *see also Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 438-39 (E.D. Pa. 2008); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807, at *1-2 (E.D. Pa. May 11, 2004); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 562 (D.N.J. 1997).  When deciding preliminary approval, a court does not conduct a "definitive proceeding on the fairness of the proposed settlement[.]"  *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983).  That definitive determination must await the final hearing, at which the fairness, reasonableness, and adequacy of the settlement are more fully assessed.  *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003).

Before the Court can grant preliminary approval and direct notice to the class, a plaintiff must "show[] that the court will likely be able to . . . approve the proposal under Rule 23(e)(2)[.]" Fed. R. Civ. P. 23(e)(1)(B) (eff. Dec. 1, 2018).  Approval under amended Rule 23(e)(2) requires that the settlement be fair, reasonable, and adequate, taking into consideration the following factors: (1) whether "the class representatives and class counsel have adequately represented the class"; (2) whether the settlement "was negotiated at arm's length"; (3) whether "the relief provided for the class is adequate"; and (4) whether the settlement "treats class members equitably relative to each other."  *Id.* (e)(2)(A)-(D).  There is, not surprisingly, overlap between the 2018 amendment's fairness, reasonableness, and adequacy considerations and those set out in the Third

Circuit test in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).[5]  Amended Rule 23(e)(2), however, establishes a uniform set of core approval factors that the Advisory Committee Note states "should always matter to the decision" of the district court as to whether to approve the proposal.  Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.  Plaintiffs, therefore, will predominantly address the amended Rule 23(e) factors now and fully address each of the *Girsh* factors in their motion for final approval of the Settlement.

Generally, a court's "first and primary concern is whether there are any obvious deficiencies that would cast doubt on the proposed settlement's fairness."  *In re Nat'l Football League Players' Concussion Injury Litig.*, 301 F.R.D. 191, 198 (E.D. Pa. 2014), *final approval aff'd*, 821 F.3d 410 (3d. Cir. 2016).  "A settlement falls within the range of possible approval," if there is a conceivable basis for presuming that the standard applied for final approval—fairness, adequacy, and reasonableness—will be satisfied."  *Silvis v. Ambit Energy L.P*, No. 14-5005, 2018 WL 1010812, at *6 (E.D. Pa. Feb. 22, 2018).[6]  After making such findings, a settlement agreement is entitled to a presumption of fairness and should be preliminarily approved.  *See Gates*, 248 F.R.D. at 439; *Gen. Motors*, 55 F.3d at 785; *In re Am. Invs. Life Ins. Co. Annuity Mktg. & Sales*

---

[5]     The factors considered for final approval of a class settlement as "fair, reasonable and adequate" include:

> "(1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation[.]"

*Id.* (ellipses in original); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534-35 (3d Cir. 2004); *Prudential*, 962 F. Supp. at 562.

[6]     Unless otherwise indicated, internal quotations and citations are omitted.

*Practices Litig.*, 263 F.R.D. 226, 238 (E.D. Pa. 2009).  Ultimately, "[t]he decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh*, 521 F.2d at 156.

As discussed below, the Settlement, which provides financial institutions with substantial monetary benefits, as well as requires meaningful improvements to Wendy's data security measures, is entitled to a presumption of fairness because the negotiations occurred at arm's-length over a period of several months, supervised by experienced neutral mediators; Class Counsel are experienced in this type of complex litigation; the Parties were well-informed of the strengths and weakness of each side's positions as a result of significant discovery; and the Settlement treats Settlement Class Members equitably relative to each other.

**B.    The Adequacy of Class Counsel and Settlement Class Representatives Supports Preliminary Approval**

This Court previously has considered Class Counsel's qualifications when appointing Erin Green Comite and Gary F. Lynch as Co-Lead Counsel.  (*See* ECF Nos. 15 & 21).  Class Counsel have extensive experience litigating complex and class actions and have demonstrated particular success in litigating data security breach class actions.  (ECF Nos. 15 at 7-18 & 15-1, Exs. A-G). Class Counsel have aggressively litigated this action – briefing numerous substantive issues, achieving early resolution of the choice of law issue to set the stage for class certification, managing the review of millions pages of documents produced by Wendy's and third parties, and drafting comprehensive mediation statements assessing the legal and factual strengths and weaknesses of the case – and thus have an adequate information base on which to negotiate this Settlement.  Lynch Decl. ¶19.  The Settlement Class Representatives have demonstrated their adequacy in selecting well-qualified Class Counsel, monitoring the Litigation, and participating in

discovery.  *Id.* ¶20.  Thus, this factor under Rule 23(e)(2)(A) weighs in favor of granting preliminary approval.

      **C.**      **The Negotiation Process Supports Preliminary Approval**

Settlements that result from arm's-length negotiations between experienced counsel are generally entitled to deference from the court.  *See In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2003 WL 23316645, at *6 (E.D. Pa. Sept. 5, 2003); *Linerboard*, 292 F. Supp. 2d at 640 (holding that "[a] presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel").  This deference reflects an understanding that vigorous negotiations between seasoned counsel protect against collusion and advance the fairness considerations of Rule 23(e).  *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, 176 F.R.D. 158, 184 (E.D. Pa. 1997) (concluding that the settlement was the product of "good faith, arms' length negotiations[,]" which eliminated "the risk that a collusive settlement agreement may [have been] reached").

As discussed above, the Settlement is the result of good faith, arm's-length negotiations between Class Counsel and Wendy's counsel in three separately scheduled mediation sessions with the supervision of two well-qualified, neutral mediators in addition to numerous direct discussions about possible resolution of the Litigation.  Lynch Decl. ¶10.  As part of the mediation process, the Parties exchanged, and provided to the mediators, comprehensive memoranda outlining the strengths and weaknesses of the claims and defenses, with citation to evidence developed during discovery.  *Id.* ¶11.  Two representatives of the Financial Institution Plaintiffs attended one of the mediation sessions.  *Id.*  Class Counsel and Wendy's counsel vigorously advocated their respective clients' positions in the settlement negotiations and were prepared to proceed to the class certification, summary judgment, and trial phases if no settlement was reached. *Id.* ¶19.  Finally, Class Counsel's attorneys' fees, costs, and expenses and Service Awards were

not discussed until after the Parties agreed on the material terms of the Settlement. *Id*. ¶12. That the Settlement was achieved through well-informed and arm's-length negotiations weighs in favor of granting preliminary approval under Rule 23(e)(2)(B).

**D.     The Adequacy of the Settlement Benefits in Light of the Risks of Continued Litigation Supports Preliminary Approval**

When considering whether "the relief provided for the class is adequate," amended Rule 23(e)(2)(C) requires the Court to take into account: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; [and] (iii) the terms of any proposed award of attorney's fees, including timing of payment[.]" Fed. R. Civ. P. 23(e)(2)(C)(i)-(iii) (eff. Dec. 1, 2018).[7]

**1.     The Relief Provided to the Settlement Class Is Substantial**

The Settlement provides substantial relief to the Settlement Class. By way of example, if valid claims are submitted for all eligible cards, it is estimated that Settlement Class Members could receive approximately $2.00 per Alerted on Payment Card. Lynch Decl. ¶14. If, for example, 40% of Alerted on Payment Cards are submitted in Approved Claims, then Settlement Class Members could receive approximately $4.80 per Alerted on Payment card. *Id*. By comparison, in *Target* and *Home Depot*, the settlements provided financial institutions with $1.50 and $2.00 fixed per-card recovery, respectively, without documentation of loss (with an option to obtain a percentage of documented losses). *See In re Target Customer Data Sec. Breach Litig.*, No. 0:14-md-02522, ECF No. 747-1, Ex. A at 4-5 (D. Minn. Apr. 11, 2016); *In re Home Depot Customer Data Sec. Breach Litig.*, No. 1:14-md-02583 ("*Home Depot*"), ECF No. 336-1 at 25

---

[7]     Rule 23(e) also requires the Court to consider "any agreement required to be identified under Rule 23(e)(3)[.]" *Id.* (e)(2)(C)(iv). No such agreements exist. Lynch Decl. ¶13.

(N.D. Ga. Aug. 23, 2017).  Thus, on a dollar-per-card basis, this Settlement is at least comparable to – and potentially much more significant than – other financial institution data breach settlements that have been finally approved.

In the financial institution data breach class action settlement context, this Settlement is unique.  It represents the only nationwide class action settlement achieved in a case where the major card brand networks, Visa and MasterCard, offered no other compensation to Settlement Class Members.  Lynch Decl. ¶15.  Unlike in other settled financial institution data breach class actions, without this Settlement, Settlement Class Members would receive no monetary compensation for the payment card reissuance costs and fraud losses incurred as a result of this Data Breach.  *Id*.

As background, each major card brand network has established a process to assess responsibility for a data breach and recover monetary compensation from the acquiring bank of a compromised merchant to be distributed to the payment card issuers.[8]  These discretionary recovery processes, such as Visa's Global Compromised Account Recovery ("GCAR") program and MasterCard's Account Data Compromise ("ADC") program, can provide partial reimbursement for operational expenses (including payment card cancellation and replacement) and incremental counterfeit fraud losses suffered as a result of a data breach.[9]  If certain qualifying criteria relating to a data breach are met and a merchant is determined to be non-compliant with PCI DSS, placing payment card data at risk, the card brands can hold the compromised merchant's acquiring bank liable and require it to pay a monetary assessment, which is, in turn, distributed to

---

[8]     *See, e.g.*, *Visa Global Compromised Account Recovery Program: What Every Merchant Should Know About GCAR*, VISA (2013), http://www.paymentworld.com/docs/training/visa/what-every-merchant-should-know-GCAR-VOL-091213-final.pdf.

[9]     *Id*. at 2.

the impacted payment card issuers.[10]  Here, financial institutions did not receive any compensation through the GCAR and ADC programs in connection with this Data Breach.  This is significant because Wendy's could argue that the lack of any assessments by the major card brands signifies that Wendy's was not liable for any damages to financial institutions arising out of the Data Breach.  While this is not the conclusion Plaintiffs would draw, the Court could have agreed, if Wendy's asserted this position, and thus, the lack of card brand assessments was a risk taken into account during the settlement negotiations.

### 2.    The Risks of Continued Litigation Are Significant

In the opinion of Class Counsel, who have substantial experience litigating complex and class actions, generally, and financial institution data breach class actions, specifically, the Settlement represents a highly favorable result for the Class, especially given the risks of continued litigation.  Lynch Decl. ¶21.  During the litigation to date, Wendy's has asserted several defenses against liability, and although Plaintiffs do not believe those defenses would carry the day, they nevertheless pose the threat of defeating Plaintiffs' claims or reducing their ultimate value.  For instance, Wendy's has argued, among other defenses, that Plaintiffs' negligence claims are barred by the economic loss rule; Wendy's owed Plaintiffs no common law duty to protect payment card data from criminal intrusion; the criminal intrusion was an intervening cause of Plaintiffs' damages; and Wendy's is not the proper defendant because certain franchisees or outside vendors were more directly at fault for the Data Breach than Wendy's.  (*See* ECF No. 139).  These defenses pose significant risks.  For example, in its MJP, Wendy's argued that the Court should follow cases like *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 817-18 (7th Cir. 2018), which have refused to recognize a duty to safeguard payment card information; held that financial

---

[10]      *Id.* at 2-3.

institution claims are barred by the economic loss doctrine; and held that the financial institutions' claims of negligence *per se*, based on §5 of the Federal Trade Commission Act, failed.

Plaintiffs also anticipate that Wendy's would oppose Plaintiffs' motion for class certification on the basis that individualized issues would defeat predominance because, from Wendy's point-of-view, the Data Breach involved many different franchisees and two separate third-party POS systems, such that each franchise's data security practices and the role of third-party service providers would have to be analyzed, implicating highly individualized issues for establishing liability and causation.  For instance, in *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007), the court denied certification of a Rule 23(b)(3) class, holding that issues of causation, comparative negligence, and damages would require individualized inquiry and precluded a finding of predominance.

Accordingly, although Plaintiffs are confident in the strength of their case against Wendy's and the likelihood of success at each stage, the outcome is nonetheless uncertain.  *See In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 273 (E.D. Pa. 2012) ("Plaintiffs not only face the risk that they will not succeed in establishing liability and damages, but also the risks associated with certifying and maintain a class."); *In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig.*, 269 F.R.D. 468, 487 (E.D. Pa. 2010) ("If it would be difficult for a plaintiff to establish liability, this factor favors settlement.").  Moreover, even if Plaintiffs were successful through trial in the district court, there would very likely be one or more lengthy appeals, including potentially an interlocutory appeal under Fed. R. Civ. P. 23(f).  *See In re Remeron End-Payor Antitrust Litig.*, No. Civ. 02-2007 FSH, 2005 WL 2230314, at *17 (D.N.J. Sept. 13, 2005).  The degree of uncertainty supports preliminary approval of the proposed Settlement Agreement.  *See In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).

Class Counsel have considered: (1) the complexities of this litigation; (2) the risks and expense of continuing this case through discovery, class certification, summary judgment, and trial against Wendy's; and (3) the likely appeal(s) if Plaintiffs do prevail at trial or earlier stages. After weighing these against the guaranteed recovery to the Settlement Class, and what Class Counsel believe to be the significant monetary benefits to the Settlement Class, Class Counsel firmly believe the Settlement represents a desirable resolution of this litigation. Lynch Decl. ¶21. Courts have accorded significant weight to the opinion of Class Counsel based on a thorough analysis of the facts. *See*, *e.g.*, *In re Gen. Instruments Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001); *Stewart v. Rubin*, 948 F. Supp. 1077, 1099 (D.D.C. 1996), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997) ("[A] court should defer to the judgment of experienced counsel who have competently evaluated the strength of the proof."); *Petruzzi's, Inc. v. Darling-Del. Co., Inc.*, 880 F. Supp. 292, 301 (M.D. Pa. 1995) ("The opinions and recommendation of such experienced counsel are indeed entitled to considerable weight.").

### 3.    The Proposed Method of Distributing Relief to the Settlement Class Is Effective

Under the Distribution Plan (SA Ex. 1) that governs payments from the Settlement Fund, Settlement Class Members that file a an Approved Claim will receive a Cash Payment Award per Claimed-On Card without having to provide supporting documentation or prove their losses. SA ¶40(b); SA Ex. 1 ¶¶2, 2.1. The amount of the cash payment will depend on the total number of eligible payment cards submitted by Settlement Class Members, the Costs of Settlement Administration, taxes paid on the Settlement Fund, and the amount of attorneys' fees, costs, and expenses and Service Awards approved by the Court. By way of example, valid claims are submitted for all eligible cards, it is estimated that Settlement Class Members could receive approximately $2.00 per Alerted on Payment Card. Lynch Decl. ¶14. If, for example, 40% of

Alerted on Payment Cards are submitted in Approved Claims, then Settlement Class Members could receive approximately $4.80 per Alerted on Payment card. *Id*. These are examples. The per-card amount actually paid may be higher or lower. However, the calculation to arrive at the Cash Payment Award per Claimed-On Card is straightforward and simple.

The Claim Form is only two pages long and requires Settlement Class Members to provide very basic information: the name of the financial institution; the person filing out the form; the financial institution's contact information; and the number of Alerted on Payment Cards. This information will be easy for financial institution employees to locate and provide. No additional documentation is required. Furthermore, Settlement Class Members can chose to submit their claims electronically through the Settlement Website. SA ¶¶35, 49(f); SA Ex. 1 ¶¶2.1-2.2; Simmons Decl. ¶19. Based on their experiences with the settlement of other class action data breach cases on behalf of financial institutions, Class Counsel believes that the simplicity of the Claim Form will increase participation from Settlement Class Members. Lynch Decl. ¶17.

      **4.     Class Counsel's Request for Attorneys' Fees, Expenses, and Costs Will Be Subject to Approval by the Court**

Finally, the Settlement requires that any award for payment of attorneys' fees, expenses, and costs is subject to proper motion to, and approval by, the Court. Class Counsel will apply to the Court for an award of 30% of the gross Settlement Fund, including any interest earned thereon, and will additionally request reimbursement of their reasonable costs and expenses from the Settlement Fund. SA ¶67. Importantly, the Parties did not discuss attorneys' fees, costs, and expenses prior to agreeing to the essential terms of the Settlement. SA ¶I; Lynch Decl. ¶12. Thirty days prior to the hearing on whether the Court should grant final approval to the Settlement, Class Counsel will submit a motion for attorneys' fees, expenses, and costs. SA ¶59. Settlement Class

Members that have objected to the Settlement by the Objection Deadline will have an opportunity to file a brief in response to Class Counsel's request for attorneys' fees, expenses, and costs.  *Id.*

Thus, all the considerations under Rule 23(e)(2)(C) support preliminary approval.

### E.     That Settlement Class Members Are Treated Equitably Relative to Each Other Supports Preliminary Approval

Finally, the Settlement Agreement is fair to the Settlement Class as a whole.  It provides no preferential treatment to some Settlement Class Members over others.  Every Settlement Class Member that submits an Approved Claim is entitled to the same relief on a per Claimed-On Card basis without having to provide documentation or prove losses.  SA Ex. 1 ¶¶2.1, 4.2.  Accordingly, this factor under Rule 23(e)(2)(D) supports preliminary approval.

All of the relevant factors – the terms of the Settlement, nature of the negotiations, well-advanced state of the Litigation at the time of Settlement, experience of Class Counsel, risks of proceeding, effectiveness of distribution, and equitable treatment of Settlement Class Members – support the conclusion that the Settlement falls within the range of possible final approval and is entitled to the presumption of fairness, permitting notice to issue to the Settlement Class. Accordingly, the Court should preliminarily approve the Settlement.

## IV.     THE SETTLEMENT CLASS SHOULD BE CERTIFIED

At this stage, Plaintiffs only seek provisional certification of the Settlement Class and authorization from the Court to send notice of the Settlement to Settlement Class Members.  As a general matter, an action may be certified for class treatment for settlement purposes.  *See*, *e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *Gen. Motors*, 55 F.3d at 777-78.  The Court first approves preliminary certification of the class.  *Certainteed*, 269 F.R.D. at 476; *Gates*, 248 F.R.D at 439.  Final certification of the settlement class is determined by the court at the same time as the court rules on final approval of the settlement class.   *Certainteed*, 269 F.R.D. at 476; *Gates*,

248 F.R.D. at 439.  Rule 23 governs the issue of class certification for both litigation and settlement classes.  A class should be certified where the four requirements of Rule 23(a) are satisfied, and when one of the three subsections of Rule 23(b) is also met.  *Warfarin*, 391 F.3d at 527-30.

The Court should certify the Settlement Class here.  Indeed, courts have recently certified similar classes in data breach cases – both for litigation purposes, *see In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482 (D. Minn. 2005), as well as for purposes of settlement.  *See Home Depot*, ECF Nos. 328 (D. Minn. Mar. 10, 2017) & 330 (D. Minn. Apr. 19, 2017); *Winsouth Credit Union v. Mapco Express, Inc.*, No. 3:14-cv-01573, ECF No. 48 (M.D. Tenn. Sept. 14, 2016).

## A.    Ascertainability

In addition to the Rule 23(a) and (b)(3) requirements, the Third Circuit imposes another requirement under Rule 23: ascertainability.  *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).  In *Byrd*, the Third Circuit explained that "[t]he ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Id.*  Here, ascertainability is satisfied, since the Settlement Class is defined as those payment-card-issuing financial institutions who received an alert from at least one of the payment card brand networks, indicating that at least one of the financial institution's payment cards was potentially exposed in the Data Breach. SA ¶¶1, 16.  The major card brand networks each have produced in the Litigation information sufficient to identify the vast majority of the financial institutions that issued an Alerted on Payment Card.  Lynch Decl. ¶14.  This allows for an objective method of verifying which financial institutions fit within the definition of the Settlement Class, and therefore, satisfies the ascertainability requirement.

B.      **Rule 23(a) Requirements**

Certification is appropriate under Rule 23(a) if:

(1)  the class is so numerous that joinder of all members is impracticable;

(2)  there are questions of law and fact common to the class;

(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)  the representative parties will fairly and adequately protect the interests of the class.

*See* Fed. R. Civ. P. 23(a)(1)-(4).

1.      **Numerosity**

The Rule 23(a)(1) numerosity requirement does not necessitate a showing that joinder is impossible, but only that joining all class members would be "impracticable," *i.e.*, difficult or inconvenient.  *See In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 477 (W.D. Pa. 1999).  "There is no magic minimum number necessary to satisfy the . . . numerosity requirement."  *Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354, 359 (E.D. Pa. 1994).  When considering the number of class members necessary to satisfy the numerosity requirement, this Court has recognized that classes as small as 40 may prove sufficient.  *See Stewart v. Abraham*, 275 F.3d 220, 226-67 (3d Cir. 2001) (a class with more than 40 will satisfy the numerosity requirement).  In addition, when considering the numerosity of the class, "[i]t is proper for the court to accept common sense assumptions in order to support a finding of numerosity."  *Cumberland Farms, Inc. v. Browning-Ferris Indus., Inc.*, 120 F.R.D. 642, 645-46 (E.D. Pa. 1988).  Class Counsel's estimate, based on data obtained from the card brand networks in third party discovery, is that approximately 7,500 different financial institutions issued approximately 18 million Alerted on Payment Cards.  Lynch Decl. ¶14.  Accordingly, the Settlement Class size estimate far exceeds 40 members, rendering joinder impracticable.  Thus, the numerosity requirement is satisfied.

### 2. Commonality

Commonality under Rule 23(a)(2) focuses on whether there exists questions of law or fact common to the class. Questions are common to the class if class members' claims "depend upon a common contention" that is "of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). The Third Circuit has a very "low threshold for commonality." *See*, *e.g.*, *Flat Glass*, 191 F.R.D. at 478; *In re Asbestos Sch. Litig.*, 104 F.R.D. 422, 429 (E.D. Pa. 1984), *aff'd in part and rev'd in part sub nom. In re Sch. Abestos Litig.*, 789 F.2d 996 (3d Cir. 1986). A common question is one that "arises from a common nucleus of operative facts regardless of whether the underlying facts fluctuate over the class period and vary as to individual claimants." *Id.* In particular, the commonality requirement may be satisfied by a single common issue. *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3rd Cir. 1994).

Here, there are many common issues of fact and law, for example:

a.   whether Wendy's owed a duty to the Financial Institution Plaintiffs and Settlement Class Members to protect payment card data;

b.   whether the Data Breach was caused by specific negligent acts or omissions on the part of Wendy's;

c.   whether the Data Breach could have been prevented or mitigated if Wendy's had acted with reasonable care; and

d.   whether the acts of third-party criminals are, as a matter of law, intervening or superseding causes of Financial Institution Plaintiffs' damages.

The answers to these questions would drive the litigation forward and resolve issues as to all Settlement Class Members, either favorably or unfavorably.  Accordingly, the Settlement Class satisfies commonality.

### 3.    Typicality

Rule 23(a)(3) requires that the class representative's claims or defenses be "typical" of the claims or defenses of the class.  "The typicality requirement is a safeguard against interclass conflicts, insuring that the named plaintiff's interests are more or less coextensive with those of the class." *Cumberland Farms*, 120 F.R.D. at 646.  "The threshold for establishing typicality is low, and Rule 23(a)(3) will be satisfied as long as the factual or legal position of the representatives are not markedly different from that of other members of the class." *Seidman*, 157 F.R.D. at 360. In fact, "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998).

Here, the claims of Plaintiffs and Settlement Class Members arise from the same conduct. Specifically, Plaintiffs' and Settlement Class Members' claims arise from Wendy's alleged implementation of data security measures at Wendy's-branded restaurants that were unreasonable and inadequate to protect Plaintiffs' and Settlement Class Members' payment card data.  There are no unique facts or circumstances that would render Plaintiffs atypical from the Settlement Class. The exposure of Plaintiffs' payment card data occurred through the same mechanism (two variants of similar malware deployed in a similar fashion) during the same time period.  Wendy's alleged conduct caused the same type of alleged injury to Settlement Class Members.  Every Settlement Class Member suffered the same varieties and types of risks and losses as a result of the Data

Breach, and the only notable variation among Settlement Class Members is the amount of damages each one suffered.

### 4.     Adequacy

The final requirement, adequacy, requires that a representative party must fairly and adequately protect the interests of the class.  Adequate representation depends on two factors: (1) the class counsel must be "qualified, experienced, and generally able to conduct the proposed litigation"; and (2) the proposed class representative must not have "interests [that] are antagonistic to those of the class." *Seidman*, 157 F.R.D. at 365.

As to the first factor, Plaintiffs are represented by counsel that is highly experienced and skilled in matters relevant to this litigation.  Gary Lynch of Carlson Lynch and Erin Green Comite of Scott+Scott possess substantial experience in class actions and other complex litigation, including data breach class actions, such as this.  (*See* ECF Nos. 15 & 15-1, Exs. A-B).  As to the second factor, Plaintiffs and each member of the Settlement Class are aligned in their interests vis-à-vis this Litigation and Wendy's.  All Settlement Class Members will receive settlement distributions according to an objective methodology that values claims using the same criteria.  SA ¶40(b); SA Ex. 1 ¶4.2.  There are no fundamental conflicts of interest among Plaintiffs or Settlement Class Members, and the named-Plaintiffs do not have interests antagonistic to the Settlement Class.  Several Financial Institution Plaintiffs contributed substantial time and resources during discovery by working with Plaintiffs' counsel to produce documents and sit for depositions.  Lynch Decl. ¶20.  These efforts on behalf of the Settlement Class demonstrate that Plaintiffs are more than adequate representatives.

### C.     Rule 23(b) Requirements

Having satisfied the four prerequisites of Rule 23(a), Plaintiffs need only show that the requirements of one subsection of Rule 23(b) have been met for the claims to be certified for class-

wide treatment. *See Baby Neal*, 43 F.3d at 55. Plaintiffs seek certification under Rule 23(b)(3), which requires a showing of predominance and superiority. *Sala v. Nat'l R.R. Passenger Corp.*, 120 F.R.D. 494, 498 (E.D. Pa. 1988).

### 1. Predominance

This rule requires only a "predominance of common questions, not a unanimity of them." *Rodriguez v. McKinney*, 156 F.R.D. 118, 119 (E.D. Pa. 1994). As long as the claims of the class members are not in conflict with each other, class members need not be identically situated and may have individualized issues. *See O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 290 (E.D. Pa. 2003). "The question is whether the class is cohesive enough to warrant adjudication by representation." *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 213 (E.D. Va. 2003). "[T]he predominance requirement focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence[.]" *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 359 (3d Cir. 2013).

Individualized damage variations among class members do not by themselves preclude a finding of predominance. First, a class may be certified for liability purposes only, leaving individual damages calculations to subsequent proceedings. *See Taha v. Cty. of Bucks*, 862 F.3d 292, 309 (3d Cir. 2017); W. Rubenstein, NEWBERG ON CLASS ACTIONS §4:54, 206-08 (5th ed. 2012). Second, a plaintiff class may prove classwide damages through use of representative evidence and statistical modeling, provided that the methodology offered is mathematically sound and comports appropriately with the plaintiffs' liability theory. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047-49 (2016); *Comcast Corp. v. Behrend*, 569 U.S. 27, 35-37 (2013). Apportionment and disbursement of the classwide damages to individual class members can be accomplished at a later stage without undermining the propriety of class certification during earlier phases. *See Tyson Foods*, 136 S. Ct. at 1049-50.

The predominate legal and factual issues in this litigation concern the nature of the Data Breach and Wendy's degree of responsibility under Ohio negligence law. In ruling on the choice of law questions presented in early 2018, the Court already determined that application of Ohio law was appropriate, with respect to the negligence and negligence *per se* claims, despite the varying home states of the Plaintiffs and the spread of the malware across Wendy's franchise restaurants nationwide. (*See* ECF 147 at 11-13). The most significant remaining issues to be litigated or tried with respect to liability were whether: Wendy's had a legal duty to Plaintiffs to protect payment card data; Wendy's breached a duty of reasonable care; Wendy's acts or omissions were the proximate cause of Plaintiffs' injuries; the allocation of responsibility as between Wendy's and its franchisees and vendors; and the economic loss rule affects Plaintiffs' claims. All of these issues could have been resolved on a classwide basis, with little to no emphasis on unique circumstances of any individual Plaintiff. *See*, *e.g.*, *Target*, 309 F.R.D. at 486-89.

These issues predominate, and the Settlement and Distribution Plan proposed by Plaintiffs ensure that individualized damage calculations do not pose a problem. Settlement Class Members will receive distributions from the Settlement Fund based on a *pro rata* basis after certain deductions (*e.g.*, attorneys' fees, costs, and expenses, Costs of Settlement Administration, taxes, and Service Awards) – a methodology that is objective, easy to calculate, and offers fair and equal treatment to all Settlement Class Members. SA ¶40; SA Ex. 1 ¶4.3.

### 2.    Superiority

"The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Prudential*, 148 F.3d at 316; *Warfarin*, 391 F.3d 516. Rule 23(b)(3) lists the following factors to guide the superiority inquiry: (1) "class members' interests in individually controlling the prosecution . . . of separate actions"; (2) whether "litigation concerning the controversy has already

29

begun by or against class members"; (3) whether "concentrating the litigation of the claims in the particular forum" is desirable; and (4) "the likely difficulties in managing a class action." Fed R. Civ. P. 23(b)(3)(A)-(D). Plaintiffs address each factor in turn.

It is in the interest of individual Settlement Class Members to proceed with this litigation as a class action. Although Settlement Class Members collectively suffered significant damages as a result of the Data Breach, those losses are distributed among several thousand card-issuing financial institutions. Settlement Class Members who issued only a few Alerted on Payment Cards will have no incentive to litigate against Wendy's individually, as their damages may only be a few hundred dollars. Even for larger issuers, the distributions offered by this Settlement likely provide better net recoveries than the Settlement Class Members could obtain by suing Wendy's individually, after costs of litigation are considered.

Plaintiffs are not aware of other pending litigation by Settlement Class Members concerning the same facts and claims. Litigation in this forum is desirable since the handful of cases filed against Wendy's in the wake of the Data Breach were all consolidated before this Court with the consent of all named Plaintiffs. And finally, the discovery conducted to date has been efficient and focused on the key common issues discussed above, allowing both Settlement Class Members and Wendy's to benefit from economies of scale and elimination of duplicative work. The Court "need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem Prods.*, 521 U.S. at 620. Resolving this Litigation by way of a class settlement in this forum is therefore a superior procedure than individual actions.

In sum, all the requirements of Rules 23(a) and (b)(3) have been satisfied and the Court should conditionally certify the Settlement Class for the purpose of dissemination of the notice.

## V.    THE PROPOSED NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS AND SHOULD BE APPROVED

### A.    The Scope of the Proposed Notice Program Is Adequate

Rule 23(c)(2)(B) states:

*For (b)(3) Classes.* For any class certified under Rule 23(b)(3)—or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. The notice must [be] clearly and concisely state[d] in plain, easily understood language[.]

Fed. R. Civ. P. 23(c)(2)(B) (eff. Dec. 1, 2018) (emphasis in original).  As the Supreme Court

explained in *Mullane v. Cent. Hanover Bank & Tr. Co.*:

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance[.]

339 U.S. 306, 315 (1950).  The proposed Notice Program in this case meets these standards.

When determining what constitutes the best notice practicable under the circumstances,

courts consider the individual facts in the case.  *See In re Prudential Ins. Co. of Am. Sales Practices*

*Litig.*, 177 F.R.D. 216, 232 (D.N.J. 1997) (quoting *Carlough v. Amchem Prods., Inc.*, 158 F.R.D.

314, 325 (E.D. Pa. 1993)) ("In all cases the Court should strike an appropriate balance between

protecting class members and making Rule 23 workable."); *see also* Fed. R. Civ. P. 23(c)(2)

advisory committee's note to 2018 amendment ("[T]he amended rule relies on courts and counsel

to focus on the means or combination of means most likely to be effective in the case before the

court.").   Here, Settlement Class Members are financial institutions that vary in size and

sophistication.   Therefore, in consultation with their proposed Settlement Administrator, the

Parties designed a multi-pronged Notice Program to ensure adequate dissemination of notice that, as detailed above in §II(D), includes: individualized direct mail; publication notice through digital media; and a dedicated telephone line and website.

For purposes of effectuating individualized Mail Notice, Class Counsel have arranged from Visa and MasterCard to submit to the Settlement Administrator the legal address of each financial institution that issued an Alerted on Payment Card.  Lynch Decl. ¶16.  Class Counsel also will provide relevant contact information to the Settlement Administrator for financial institutions that issued American Express, Discover, and JCB Alerted on Payment Cards.  *Id*.  The Settlement Administrator will use this data, along with other reasonably available sources, to compile a final list of potential Settlement Class Members to which Mail Notice will be issued.  Simmons Decl. ¶13.  Despite the likely reach of Mail Notice, the Settlement Administrator also will disseminate a summary notice through several digital journals, such as the ABA Banking Journal, commonly read by financial institution executives.  Simmons Decl. ¶¶16, 22.  Then, the Settlement Website and toll-free telephone line, both with live customer support available, will further support Settlement Class Members and facilitate resolving any questions Settlement Class Members have. Simmons Decl. ¶¶17-21.  Courts routinely find that individual direct Mail Notice, along with publication notice, is "ideal" and "the best possible" method of notice and fully satisfies the requirements of Rule 23(c) and due process.  *See*, *e.g.*, *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 527-28 (D.N.J. 1997); *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 836 (W.D. Pa. 1995).  The Parties' proposed Notice Plan exceeds even this standard by adding a dedicated telephone number and website with live customer support.

### B.      The Form and Content of the Proposed Notices Is Adequate

The form of the class notice is governed by Rule 23(c)(2), which provides that:

[t]he notice must clearly and concisely state in plain, easily understood language:

    (i)   the nature of the action;

    (ii)  the definition of the class certified;

    (iii) the class claims, issues, or defenses;

    (iv) that a class member may enter an appearance through an attorney if the member so desires;

    (v)  that the court will exclude from the class any member who requests exclusion;

    (vi) the time and manner for requesting exclusion; and

    (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).  The proposed Notices are written in plain English; describe the litigation, claims being made, and terms of the Settlement; and inform Settlement Class Members about the deadlines and their rights to opt out or object.  *See* SA Exs. 2-3.  Thus, the proposed Notices in this Litigation meet all of the Rule 23(c)(2)(B) requirements.  *See* Simmons Decl. ¶¶23-26.

### C.    The Proposed Claim Form Is Adequate

The Claim Form (SA Ex. 1, Attachment A) clearly informs the Settlement Class Members of the process they must follow.  It is only two pages long and requires Settlement Class Members to provide very basic information: the name of the financial institution; the person filing out the form; the financial institution's contact information; and the number of Alerted on Payment Cards. This information will be easy for financial institution employees to locate and provide.  Class Counsel believe that the Claim Form is adequate and that the stark simplicity of the process will increase participation from Settlement Class Members.  Lynch Decl. ¶17.

### D.    The Settlement Administrator Is Adequate

The Court should also approve Analytics Consulting LLC ("Analytics") to serve as the Settlement Administrator.  Analytics is a well-known firm with a history of successfully administering many class action settlements.  Simmons Decl. ¶¶2-4.  Class Counsel, with Wendy's approval, selected Analytics after obtaining and reviewing proposals from three additional

administration firms and believe that Analytics will be able to meet the obligations imposed on the Settlement Administrator under the Settlement in a cost-effective manner.  Lynch Decl. ¶22.

## VI.    CO-LEAD COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL

Gary F. Lynch and Erin Green Comite should be appointed as Class Counsel.  Rule 23(g) enumerates four factors for evaluating the adequacy of proposed class counsel: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and types of claims of the type asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources counsel will commit to representing the class[.]"  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

All of these factors militate in favor of appointing Mr. Lynch and Ms. Comite as Class Counsel.  Since the Court's appointment of Mr. Lynch and Ms. Comite as Co-Lead Counsel, they have devoted significant time and resources to prosecuting this action on behalf of Plaintiffs and the proposed class.  Lynch Decl. ¶19.  Mr. Lynch and Ms. Comite have extensive experience in class actions, particularly those involving financial institution card data breaches, as demonstrated by the numerous times their respective firms have been appointed to leadership positions in similar actions.  (*See* ECF Nos. 15 & 15-1, Exs. A-B).  Accordingly, Mr. Lynch and Ms. Comite will adequately represent the interests of the Class and should be appointed as Class Counsel.

## VII.    CONCLUSION

For the reasons set forth above, Plaintiffs request that the Court enter the Preliminary Approval Order (SA Ex. 4), that grants preliminary approval to the Settlement; certifies the Settlement Class for settlement purposes; sets opt-out and objection deadlines and a date for a Final Approval Hearing; appoints Mr. Lynch and Ms. Comite as Class Counsel; appoints Analytics as Settlement Administrator; and approves the proposed Notice Program.

Dated: February 13, 2019

**CARLSON LYNCH SWEET**            **SCOTT+SCOTT**
**KILPELA & CARPENTER, LLP**       **ATTORNEYS AT LAW LLP**

 */s/ Gary F. Lynch*                         */s/ Erin Green Comite*
Gary F. Lynch                              Erin Green Comite
Jamisen A. Etzel                           Joseph P. Guglielmo
1133 Penn Avenue, 5th Floor             156 South Main Street
Pittsburgh, PA 15222                   P.O. Box 192
T: 412-322-9243                         Colchester, CT 06415
F: 412-231-0246                         Telephone: (860) 537-5537
glynch@carlsonlynch.com              Facsimile: (860) 537-4432
jetzel@carlsonlynch.com               ecomite@scott-scott.com
                                   jguglielmo@scott-scott.com

*Co-Lead Counsel and Proposed Class Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 13, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

 <u>/s/ Erin Green Comite</u>
Erin Green Comite (*pro hac vice*)
